# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  THOMAS FRANCIS YOUNG
and CONSUELA ANGELINA YOUNG,                    No. 7-11-12554 JS

     Debtors.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on the Motion for Relief from Stay by BANK'34, filed June 7, 2011 ("Motion for Relief From Stay") (Docket No. 12), the Emergency Motion to Prohibit Use of Cash Collateral, filed June 24, 2011 ("Motion to Prohibit Use of Cash Collateral") (Docket No. 29), and the Debtors' objections thereto.  *See* Docket Nos. 24 and 45. [1] BANK'34 seeks relief from the automatic stay to permit it to foreclose its liens against certain real and personal property that is property, and seeks an order prohibiting the Debtors from using cash collateral pledged to BANK'34.  The Court held a final evidentiary hearing on the Motion for Relief From Stay and the Motion to Prohibit Use of Cash Collateral on August 5, 2011 and took the matters under advisement.

Based on the evidence presented at the final hearing, the relevant case law, and arguments of counsel, and being otherwise sufficiently informed, the Court will deny BANK'34's Motion for Relief From Stay and Motion to Prohibit Use of Cash Collateral but will order adequate protection for BANK'34 consistent with this memorandum opinion.

## PROCEDURAL BACKGROUND

The Debtors, Tom F. Young Sr. and Consuelo A. Young (known as Connie Young), commenced their chapter 11 case *pro se* on May 31, 2011 (the "Petition Date").  On June 23,

---

[1] First American Bank filed a joinder in a motion to dismiss or convert filed by the United States Trustee. First American Bank's joinder in the United States Trustee's motion was also set for hearing on August 5, 2011.  The United States Trustee withdrew its motion to dismiss or convert prior to the hearing.  First American Bank failed to appear at the hearing.  Therefore, the Court denied First American Bank's request to dismiss or convert.

2011, the United States Trustee filed a motion to dismiss or convert this chapter 11 case, and withdrew the motion on July 28, 2011. On July 5, 2011, William F. Davis & Assoc., P.C. filed an application to represent the Debtors in this bankruptcy case. An order granting the application was entered August 3, 2011. The Debtors filed their Statement of Financial Affairs and Schedules on July 18, 2011. The Section 341(a) creditors meeting was held and concluded on July 21, 2011.

## FACTS

The Debtors are the sole members of Laguna LLC, a New Mexico limited liability company that owns and operates a health club business in Las Cruces, New Mexico known as Tom Young's Fitness Center. Only one of those units is currntly rented. The Debtors commenced their chapter 11 case as result of declining revenues of Laguna LLC and the high vacancy rate of the Santa Fe rental units.

At the final hearing, Mr. Young testified that Tom Young's Fitness Center was profitable in 2007 and 2008, and projected the business will regain profitability within a year or two. The Debtors' exit strategy for their chapter 11 case is to increase revenues at the Tom Young's Fitness Center and to lower their required debt service by selling or surrendering the Santa Fe rental units.

Some years ago, following the Debtors' retirement from the Tom Young's Fitness Center business, one of their sons, Tom Young Jr., and a business partner, were in charge of operating the business. The business partner withdrew from the business in February 2008. The Debtors formed Laguna LLC the next month and again became active in the business. They transferred the Tom Young's Fitness Center business to Laguna LLC, and leased to Laguna LLC, under a Commercial Lease, the land and buildings in Las Cruces (the "Real

-2-

Property") where the business operates. The Commercial Lease, made as of April 1, 2008 between the Debtors and Laguna LLC (the "Commercial Lease"), provides for the Debtors' lease of the Real Property and equipment[2] to Laguna LLC for the sum of $12,000 per month. The lease term commenced April 1, 2008 and expires April 5, 2018, subject to a 5-year renewal option at a lease rate of $15,000 per month.

After the formation of Laguna LLC, the Debtors began managing the Tom Young's Fitness Center business along with their son, Tom Young Jr. Since approximately March 2008, the Debtors each have worked at the Tom Young's Fitness Center in Las Cruces, often ten hours per day and generally for at least five consecutive days at a time. They commute between Santa Fe, where they reside, and Las Cruces where the Tom Young's Fitness Center business is located. At times Laguna LLC has had an arrangement with a local hotel to trade fitness center passes for hotel employees for nights the Debtors would stay at the hotel while in Las Cruces. At other times the Debtors lease an apartment in Las Cruces at Laguna LLC's expense, and stay there when working at the fitness center. Laguna LLC also pays the Debtors' food expenses while they stay in Las Cruces. The Debtors use the Debtors' personal vehicles for the commute between Santa Fe and Las Cruces. Laguna LLC makes the lease payments on one of their personal vehicles. Laguna LLC books those lease payments as member withdrawals.

On or about August 30, 2008, BANK'34 made two loans to the Debtors: 1) a term loan in the amount of $1,217,041.38; and 2) a line of credit loan in the amount of up to $199,081.40. The term loan refinanced a loan from a different lender. As collateral for the loans, the Debtors granted BANK'34 a mortgage against the Real Property. At the time the loans were made,

---

[2] It is not clear from the evidence before the Court what equipment used in the Tom Young's Fitness Center business is owned by Laguna LLC and what equipment is owned by the Debtors and leased to Laguna LLC. As a result, no ruling is made regarding the nature or extent of any equipment pledged to BANK'34. Any equipment collateral is disregarded in connection with BANK 34's motion for relief from the stay.

BANK'34 was aware that the Debtors had formed Laguna LLC, and that Laguna LLC owned and operated the Tom Young's Fitness Center business. No property of Laguna LLC was pledged to BANK'34 as collateral for the loans. The amount of monthly rent payable by Laguna LLC to the Debtors under the Commercial Lease approximately equaled the amount of monthly debt service to be made by the Debtors to BANK'34.

In 2010, at the Debtors' request, BANK'34 agreed to reduce the payments under both loans to monthly installments of interest only for the months of July 2010 through December 2010. The Debtors requested the loan concession as a result of decreased revenue of the Tom Young's Fitness Center business. In exchange, on or about August 20, 2010, the Debtors granted BANK'34 a security interest in, among other things, all of their inventory, equipment, accounts, money, rights to payment and performance, and general intangibles. BANK'34 perfected the security interests by filing a financing statement on September 9, 2010 in the records of the New Mexico Secretary of State.

In connection with the Debtors' request to pay interest only to BANK'34, the Debtors submitted a personal financial statement to BANK'34 dated August 3, 2010. The personal financial statement reflected that Connie Young's monthly average income in the form of commissions from the sale of real estate was $8,000 for the "last tax year." The Debtors listed no other income on the financial statement except for social security income. The Debtors' federal income tax return for tax year 2009 reflects to receipts by Connie Young from real estate sales and service in the amount of $31,692, or approximately $3,000 per month.

The Debtors made the interest only payments to BANK'34 for the months of July 2010 through December 2010 from rent paid them by Laguna LLC under the Commercial Lease for the Real Property. BANK'34 declined the Debtors' request to extend the interest only period

-4-

beyond December 31, 2010 because the Debtors failed to provide BANK'34 with a business plan showing how they would be able to pay the loans on a current basis after the requested extended interest only period would expire. After December 2010, the Debtors made two principal and interests payments to BANK'34, and then stopped making payments. The last payment the Debtors made to BANK'34 was in April 2011, which represented the amount due under the loans in February 2011. By a letter dated March 30, 2011, BANK'34 gave the Debtors notice of default and a 10-day opportunity to cure.

Laguna LLC's compiled financial statements for the eleven month period ending November 30, 2010 reflects revenue in the amount of $483,189.01, or a monthly average of about $44,925. In recent years the Debtors generally have taken less than $1,000 per month as member withdrawals from Laguna LLC. Laguna LLC's general ledger for the six month period ending June 30, 2011 reflects the following pre-petition member withdrawals: 1) $400.00 by Connie Young in May 2011; 2) $5,526.73 by Tom Young Sr. in January 2011; and 3) an average of $699.80 per month for the months of February through May 2011 by Tom Young Sr. During this period, the Debtors had other sources of income to pay their living expenses, including rental income and income from the sale of property. The general ledger shows post-petition withdrawals in June 2011 by Connie Young in the amount of $700.00 and by Tom Young Sr. in the amount of $5,480.06.

Tom Young Jr. is paid $4,000 per month for his services as general manager of the Tom Young's Fitness Center business. He works full time in exchange for the compensation Laguna LLC pays him. After commencement of this chapter 11 case, Laguna LLC has been paying the Debtors in the form of membership withdrawals a total of approximately $3,000 to $5,000 per month in exchange for their services. Tom Young Sr. testified that the Debtors no longer have

the same access to funds from other sources to pay their living expenses and are now more dependent on taking draws from Laguna LLC in exchange for services.

Laguna LLC, which owns and operates the Tom Young's Fitness Center business, maintains its own books and records of account, has its own bank accounts, files its own tax returns, has employees, issues its own financial statements, and retains its own professionals.

Laguna LLC paid the Debtors pre-petition rent in the amount of $45,930.90 for the period from January 2011 through May 2011. Laguna LCC's general ledger reflects that Laguna LLC paid the Debtors post-petition rent on June 11, 2011 in the amount of $2,000.00.[3] Laguna LLC has paid no other rent to the Debtors post-petition. The Debtors have not made any post-petition efforts to enforce the terms of the Commercial Lease between them and Laguna LLC.

Laguna LLC has paid certain expenses incurred by the Debtors personally. Those expenses include $91.57 on May 5, 2011 to Break Masters; $145.70 on May 31, 2011 to the City of Santa Fe; $80.00 on June 2, 2011 to a medical doctor; and $124.74 on July 12, 2011 to AutoZone. Laguna LLC booked the disbursements to Brake Masters and the City of Albuquerque as member withdrawals.[4] In addition, on July 5, 2011 Laguna LLC loaned $2,475 to Diocenes LLC, an entity in which one of the Debtors' sons, Kirk Young, has an interest. Kirk Young signed the check for the loan to Diocenes LLC without the knowledge or consent of the Debtors. When Tom Young Sr. learned of the check, he admonished his son, and Diocenes LLC returned the funds to Laguna LLC.

---

[3] Tom Young Sr. testified that Laguna LLC booked the $2,000 as rent in error because the rent mistakenly was specified on the check by which the payment was made. Tom Young Sr. testified that the payment actually was a member draw.

[4] The evidence before the Court does not reflect how Laguna LLC booked the June 2, 2011 disbursement to a medical doctor or the July 12, 2011 disbursement to AutoZone.

BANK'34's appraiser, Karen Mundy, testified that the fair market value of the Real Property was $1,860,000 as of April 18, 2011. The Debtors did not contest that opinion of value for purposes of the Court's rulings on BANK'34's two pending motions. Ms. Mundy testified that as of the date of the August 5, 2011 hearing on BANK'34's motions, the value of the Real Property had not changed.

As of the Petition Date, the Debtors were indebted to BANK'34 in the total amount of $1,455,489.14, including principal, interest, late fees and an appraisal fee but excluding accrued interest calculated at the difference between the non-default and default rates and further excluding attorney's fees.[5] As of the Petition Date, the Debtors were also in arrears on 2009 and 2010 property taxes against the Real Property in the amount of $21,266.69, excluding interest and penalties. As of July 19, 2011, post-petition interest at the non-default rate had accrued on the two loans in the amount of $14,855.82. Daily interest accrual at the non-default rate is $303.18.

BANK'34's appraiser testified that the estimated marketing period to sell the Real Property is "up to" 12 months. She opined that a sale likely would occur closer to the end of the 12-month period because of the special use nature of the Real Property.

If BANK'34 were to sell the Real Property at its appraised value on the date that is 12 months after July 19, 2011 as part of the Bank's real estate owned, and the Debtors made no further payments to BANK'34 and no further property taxes were paid in relation to the Real Property prior to the date of sale, the estimated net sale proceeds after payment to BANK'34 in full would be approximately $30,000 to $60,000, calculated as follows:

Sale proceeds                           $1,860,000

---

[5] The amount of accrued but unpaid pre-petition interest calculated at difference between the non-default and default interest rates, and the amount of BANK's 34's attorney's fees incurred in connection with a default under the loans, are not before the Court.

| | |
|---|---|
| Estimated costs of sale | (186,000) |
| Net Sale Proceeds | 1,674,000,000 |
| Payment of debt to BANK'34[6] | |
| (Owed as of 07-19-11) | (1,491,611.65) |
| 12 months interest accrual | (110,660.70) |
| NET before attorneys fees | $ 71,717.65 |
| Estimated attorneys fees | $10,000 to $40,000 |
| | |
| NET SALE PROCEEDS | $31,717.65 to $61,717.65 |

DISCUSSION

A.   Relief From the Automatic Stay

BANK'34 seeks relief from the automatic stay pursuant to both 11 U.S.C. § 362(d)(1) and 11 U.S.C. § 362(d)(2).  Under 11 U.S.C. § 362(g), BANK'34 has the burden of proof on the issue of the Debtors' equity in the collateral pledged to BANK'34, and the Debtors have the burden of proof on all other issues.

1.   *Stay Relief Under 11 U.S.C. § 362(d)(1)*
     *Based On the Debtors' Bad Faith Conduct*

BANK'34 argues that cause exists for relief from the automatic stay under 11 U.S.C. § 362(d)(1) because of the Debtors' bad faith conduct.  The bad faith conduct alleged by the BANK'34 includes that Debtors' failure to enforce the terms of the Commercial Lease between them and Laguna LLC to deprive BANK'34 to a claim to cash collateral in this chapter 11 case, while at the same time the Debtors have 1) increased the amount of their personal draws from Laguna LLC; 2) used funds of Laguna LLC to pay personal bills; and 3) caused Laguna LLC to unnecessarily employ both the Debtors and their son Tom Young Jr.  In addition, BANK'34 asserts that the Debtors issued a false financial statement to BANK'34 in August 2010 by

---

[6] This amount includes 2009 and 2010 property taxes and excludes attorney's fees, interest and penalties on unpaid property taxes, and interest accrued at the difference between the default and non-default interest rates.

overstating the amount of Connie Young's commission income from her realtor business, and improperly depreciated a vehicle on a 2009 tax return as an asset of the realtor business.

The Bankruptcy Code does not define "cause" under 11 U.S.C. § 362(d)(1). *In re Trident Associates Ltd. Partnership,* 52 F.3d 127, 131 (6th Cir. 1995). Bad faith can constitute cause for relief from the stay under 11 U.S.C. § 362(d)(1). *Id*; *In re JE Livestock, Inc*., 375 B.R. 892, 897-98 (10th Cir.BAP 2007). Typically, the type of bad faith justifying relief from the stay is the bad faith filing of the bankruptcy case.[7] Because this Court finds that the Debtors have not engaged in bad faith conduct warranting relief from the stay even if post-petition conduct may be considered, the Court need not determine whether the only type of bad faith conduct that may justify stay relief is the bad faith filing of a bankruptcy case.

The Court does not find bad faith on the part of the Debtors in connection with their failure to enforce the terms of the Commercial Lease. The Debtors, as debtors-in-possession, owe a fiduciary duty to creditors to maximize the value of the estate.[8] That duty includes the duty to exercise reasonable business judgment with respect to enforcement of the terms of the Commercial Lease. Because the Debtors are dealing with a lessee entity they control, their dealings with Laguna LLC are subject to closer scrutiny by the Court.[9] The amount of monthly rent Laguna LLC owes to the Debtors approximates their monthly debt service obligations to BANK'34 historically has served as the source of funds used to make the debt service. Post-

---

[7] E.g. *Trident Associates*, 52 F.3d at 131; *In re Dixie Broadcasting, Inc*., 871 F.2d 1023, 1026 (11th Cir. 1989); *In re Ramkaran*, 315 B.R. 361, 365 (D.Md.2004); *In re Loucheschi LLC*, 2011 WL 3319891, *4 (Bankr.D.Mass. 2011); *In re FRE Real Estate, Inc*., 450 B.R. 619, 623 Bankr. N.D.Tex. 2011); *In re 221-06 Merrick Blvd. Associates LLC*, 2010 WL 5018265, *3 Bankr.E.D.N.Y. 2010).

[8] *In re ASARCO, L.L.C.* _ F.3d _, 2011 WL 3569285 (5th Cir. 2011)(C.A.5 (Tex.),2011(the debtor-in-possession has a fiduciary duty to creditors and equity holders, and must have some articulated business justification for using, selling, or leasing the property outside the ordinary course of business); In re Reliant Energy Channelview LP 594 F.3d 200, 210 (3rd Cir. 2010) (the debtor -in-possession has a fiduciary duty to maximize the value of the estate); In re Scott 172 F.3d 959, 967 (7th Cir. 1999)(the debtor-in-possession owes a fiduciary duty to his creditors).

[9] E.g. *In re Alma Energy, LLC*, 2010 WL 4736905, *5 (E.D.Ky. 2010); *In re Jordan River Resources, Inc*. _B.R._, 2011 WL 3625096*2 (Bankr. W.D. Mich, 2011); *In reHyLoft, Inc*. 451 B.R. 104, 113-114 (Bankr. D.Nev. 2011).

-9-

petition, Laguna LLC ceased paying rent, except for $2,000 paid in June 2011.  Tom Young Sr. testified that Laguna LLC's financial difficulties have prevented Laguna LLC from paying the rent post-petition and keeping its other obligations current.  He further testified that he and his wife are working hard to restore Laguna LLC to profitability.  Wendy Flamm, a BANK'34 loan officer, testified that if Tom Young's Fitness Center closed, the value of the land and building pledged to BANK'34 would greatly decline.  The Court finds that, under these circumstances, the Debtors have not breached their fiduciary duty as debtors-in-possession by failing to take action to collect rent from Laguna LLC or terminate the Commercial Lease.

BANK'34 questions whether Laguna LLC requires the services of both Debtors and their son Tom Young Jr.  Based on the facts in evidence, the Court finds that Laguna LLC's employment of Tom Young Sr., Connie Young and Tom Young Jr. is a reasonable exercise of business judgment.  The family members work long hours for below market wages in an effort to save a family business.

BANK'34 asserts that Tom Young Sr. and Connie Young should not take draws in excess of the approximate $1,000 month they historically withdrew from Laguna LLC in exchange for services so additional Laguna LLC funds would be available to pay rent. BANK'34 further asserts that Laguna LLC should not pay for lodging or food for the Debtors while they reside in Las Cruces while working for Laguna LLC.  Taking into account the amount Laguna LLC pays the Debtors, the amount Laguna LLC expends for lodging and food for the Debtors, the Debtors' explanation about their no longer having other sources of funds to pay personal expenses, and the number of hours the Debtors work for Laguna LLC, the Court finds that the Debtors are exercising reasonable business judgment regarding these matters and further finds that the amount of their monthly draws is not excessive.

-10-

BANK'34 urges that the Debtors are improperly using Laguna LLC as their "personal piggy bank" in disregard of the separate nature of the entity, which is further evidence of bad faith on their part. In support of its position, BANK'34 relies on four disbursements in the first six months of 2011 totaling $350.44, at least two of which Laguna LLC booked as member withdrawals; monthly lease payments made by Laguna LLC on one of the Debtors' personal vehicles, which Laguna LLC booked as member withdrawals; and an unauthorized loan made by Laguna LLC in the amount of $2,475 where the funds were returned upon Tom Young Sr. learning of the loan. Laguna LLC's annual revenue exceeds $500,000. The Court finds that this conduct, considered either alone or in conjunction with the Debtors' other conduct, does not constitute bad faith for which relief from the automatic stay should be granted.

2. *Stay Relief Under 11 U.S.C. § 362(d)(1)*
   *Based On Lack of Adequate Protection*

BANK'34 asserts it is entitled to stay relief under 11 U.S.C. § 362(d)(1) because its secured claim is not adequately protected. BANK'34 has a secured claim in the amount of $1,491,611.65 as of July 17, 2011.[10] The fair market value of its collateral as of that date is $1,674,000.00. Based on these figures, BANK'34's security cushion computed as a loan to value ratio is 10.9% as of July 17, 2011. BANK'34 argues that it is entitled to adequate protection because 1) interest will accrue during the estimated marketing period for the property if BANK'34 were to foreclose its lien, thereby eroding its security cushion; 2) BANK'34 will incur additional attorney's fees to collect its claim; 3) property taxes are accruing and are not being paid; 4) if the Bank acquired the Real Property at a foreclosure sale and resold the property, the sale proceeds realized by the Bank will be reduced by costs of sale; and 5) a sale by a bank from real estate owned is perceived by buyers as a distressed sale and will not yield

---

[10] This claim amount excludes attorney's fees, interest and penalties on unpaid property taxes, and interest accrued at the difference between the default and non-default rates. No evidence was presented regarding these amounts.

the appraiser's estimate of fair market value.  The Court agrees, in part, and disagrees, in part, with BANK'34's contentions.

The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment's prohibition against taking private property without just compensation.[11]  A secured creditor is entitled to adequate protection as condition to continuation of the automatic stay to compensate or protect the creditor from a decrease[12] or threatened decrease [13] in the value of the estate's interest in property that is the creditor's collateral as a result of the automatic stay.  Bankruptcy Code Section 361 provides a nonexclusive list of how adequate protection may be provided when it is required under 11 U.S.C. § 362.  Such adequate protection includes "cash payment or periodic cash payments … to the extent the stay under section 362 …. results in a decrease in the value of such entity's interest in such property;" and "an additional or replacement lien to the extent that such stay … results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1) and (2).

---

[11] *E.g.  In re Panther Mountain Land Development, LLC,* 438 BR 169, 189-90 (Bankr. ED Ark. 2010)("The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment"); *In re Cambridge Woodbridge Apartments,* L.L.C., 292 B.R. 832, 841 (Bankr. N.D.Ohio,2003)(same); *In re Cardell, Inc.,* 2009 WL 1973551, *3 (D..N.J.,2009)("[a]dequate protection, as derived from Fifth Amendment protection of property interests, reconciles the competing interests of the debtor and the secured creditor, who is entitled to constitutional protection for bargained-for property interests").

[12] *In re Big3D, Inc*., 438 B.R. 214, 220-21 (9th Cir.BAP 2010)(adequate protection is intended to compensate a secured creditor whose collateral is declining); *In re DB Capital Holdings, LLC*, _ B.R. _, 2011 WL 2118877. *10 (Bankr. D.Colo.,2011)(same); *In re SW Boston Hotel Venture LLC*, 449 BR 156, 175-76 (Bankr. D. Mass. 2011)(same); *In re Panther Mountain Land Development, LLC,* 438 BR at 189-90 (the purposed of adequate protection is to guard the secured creditor's interest the declining collateral value); *In re Theodore A. Thompson*, 2008 WL 2157163, *2 (Bankr N.D. Ill 2008)(adequate protection is some form of assurance that the creditor will not suffer a decline in the value of its collateral).

[13] See *e.g. In re Price,* 370 F.3d 362, 372 (3rd Cir. 2004)("If the value of collateral is threatened, creditors may seek adequate protection and relief from the automatic stay…."); *In re Panther Mountain Land Development, LLC*, 438 B.R. at 190("In order to establish a *prima facie* case of a lack of adequate protection, the moving party must provide evidence that the value of the collateralized property is declining, or at least threatened, as a result of the automatic stay."); *In re Box*, 324 B.R. 290, 292 (Bankr..S.D.Tex. 2005)("To establish a prima facie case for cause due to a lack of adequate protection, a movant must initially demonstrate that it holds a claim, secured by a valid, perfected lien upon estate property, and that a decline in the value of its collateral is either occurring or is threatened.").

A decline in the value of the estate's interest in property that is the creditor's collateral, which entitles the creditor to adequate protection, can result from such causes as a decline in the market value of the collateral,[14] non-payment of interest accruing on a senior lien, or non-payment of property taxes having priority over the creditor's lien.[15]  A threatened decline in the value of a creditor's collateral entitling the creditor to adequate protection can occur, for example, from lack of insurance, failure to maintain the collateral, failure to permit periodic inspections, or a failure to report information affecting the collateral.[16]  If a secured creditor has a security cushion sufficient to protect it from the declining value of its collateral,[17] then the security cushion may provide adequate protection for the declining value.[18]  What constitutes adequate protection is a question of fact to be determined on a case-by-case basis.[19]

[14] *E.g. United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *In re American Consolidated Transportation Companies*, 2010 WL 3655485, *4 (Bankr. N.D.Ill. 2010)(the secured creditor is entitled where the value of the collateral is declining); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y.1994)(the secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay.)

[15] *E.g. In re May*, 2002 WL 32114562, *3 (Bankr. E.D.Ark. 2002)( a creditor is entitled to adequate protection against factor's jeopardizing its collateral, such as failure to maintain or insure the collateral); *In re Anthem Communities/RBG, LLC*, 267 B.R. 867, 871 (Bankr. D.Colo. 2001)(a creditor is entitled to adequate protection from a decline or threatened decline in the value of its collateral); *In re Self*, 239 B.R.877, 881 (Bankr.E.D.Tx 1999) (to establish a prima facie case for adequate protection, the moving party must prove that the value of its collateral is declining or at least threatened).

[16] *In re Delaney-Morin*, 304 B.R. 365, 370 n.3 (9th Cir.BAP 2003)("Property insurance generally constitutes an indispensable protection and lack of insurance jeopardizes a secured creditor's interests in its collateral."; *In re Graham*; 2008 WL 7400623, *5 (Bankr. D.Ga.,2008)(stay modified in part because the debtor could not maintain the collateral); *In re Kiesewetter*, 337 B.R. 75 79 (Bankr.W.D.Pa. 2006)(where court ordered debtors to adequately protect the creditor by making periodic payments,  providing evidence of insurance and allowing inspection of the property);  *In re Steele*, 182 B.R. 284, 290 (Bankr. W.D.Okl.1995)(citing *In  re Rogers*, 1993 WL 773862, *4 (Bankr.W.D.Okla., 1993)(where Court reasons that adequate protection for creditor should include reasonable access to the property for inspection and proof of appropriate insurance coverage).

[17] The Court uses the phrase "security cushion" to refer to the equity in the property above the amount of the creditor's lien, *i.e.* the difference between 1) the value of the property and 2) the sum of the amount of the creditor's lien and all liens senior in priority to the creditor's lien.  The Court uses the phrase "equity cushion" to refer to the equity for the debtor, *i.e.* the difference between 1) the value of the property and 2) the sum of all liens against the property regardless of priority.

[18] *E.g. Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997)(Court finds equity cushion of one thousand  percent sufficient to provide adequate protection); *In re Van Horn*, 2011 WL 1900324, *4 (Bankr. M.D.Pa. 2011)(where Court states that a substantial equity cushion can provide adequate protection); *In re Franklin Equipment Co.*, 416 B.R. 483, 528 (Bankr. E.D.Va. 2009)(where Court agrees with case law finding that sufficient equity cushion can provide adequate protection).

[19] *In re Pomodoro Restaurant*, 251 B.R. 441, *4 (10th Cir.BAP 1999)(unpublished opinion)("A bankruptcy court has considerable discretion in balancing the factors in awarding adequate protection and any such determination is

The evidence before the Court is that the Real Property is neither increasing nor declining in value, that the Debtors are not paying post-petition property taxes accruing against the Real Property, that the Debtors have collected $2,000 of post-petition rents under the Commercial Lease, and that the Bank's has a 10.9% security cushion. BANK'34 is entitled to adequate protection from a decline in the value of its interest in the Real Property as a result of the Debtors' nonpayment of property taxes accruing from and after the date BANK'34 filed its Motion for Relief From Stay, and with respect to the Debtors' use of $2,000 of post-petition rents pledged to the Bank without the consent of the Bank or an order of the Court. BANK'34 has established that its security cushion is insufficient to protect the Bank from the risk of accruing taxes or the expenditure of its cash collateral without authority.

As adequate protection for Bank'34, the Debtors will be required to deposit in a separate account by the 20th day of each month an amount equal to the estimated $11,000 of annual taxes against the Real Property, prorated for the prior month (except the payment to be deposited for taxes accruing in June 2011 will be prorated to the portion of June 2011 after the Motion for Relief From Stay was filed). The pro-rated taxes for June 2011 and July 2011 shall be deposited by September 20, 2011. The tax deposits may be made from rent Laguna LLC pays the Debtors, member withdrawals or other funds. Funds on deposit in the separate account will be earmarked to pay taxes against the Real Property, and BANK'34 will be granted a lien against those funds regardless of the source of the funds. In addition, the Debtors shall pay BANK'34 the sum of $2,000 within thirty days after the date of entry of the order accompanying this Memorandum Opinion. If the Debtors fail to comply with these

to be done on a case-by-case basis."); *May*, 2002 WL 32114562, *3 ("What constitutes adequate protection is a factual issue to be decided on a case-by-case basis.")

requirements, the Court will consider appropriate relief on short notice on a request by

BANK'34.

BANK'34 is not entitled to adequate protection to compensate or protect it from erosion

of its security cushion caused by post-petition interest accrual.[20]  In *United Savings Association*

*of Texas v. Timbers of Inwood Forest Associates, Ltd.*. 484 U.S. 365, 369-82, 108 S.Ct. 626,

629-36 (1988), the United States Supreme Court held that an under-secured creditor is entitled

to adequate protection to compensate it for a decline in the value of its collateral; but not for

delay caused by the automatic stay, such as a loss of reinvestment earnings upon foreclosure of

liens against collateral or interest to compensate the creditor for delay resulting from the

automatic stay.  The Court reasoned that under 11 U.S.C. §§ 502 and 506(b) post-petition

interest accrual on a secured creditor's allowed secured claim is paid out of the creditor's

security cushion and is limited to the amount by which the creditor's claim is over-secured.[21]

The under-secured creditor who has no security cushion therefore is not entitled to post-petition

interest.  The Court explained:

> Even more important for our purposes than § 506's use of terminology is its
> substantive effect of denying undersecured creditors postpetition interest on their
> claims-just as it denies over secured creditors postpetition interest to the extent
> that such interest, when added to the principal amount of the claim, will exceed
> the value of the collateral….  Since this provision permits postpetition interest to
> be paid only out of the "security cushion," the undersecured creditor,who has no
> such cushion, falls within the general rule disallowing postpetition interest. See 11
> U.S.C. § 502(b)(2).

> *Timbers*, 484 U.S. at 372-373, 108 S.Ct. at 631.

---

[20] *See* In *re Westchase I Associates, L.P.*, 126 B.R. 692, 694 (W.D.N.C. 1991) ("[I]f the value of the property itself
is not declining, as is the case here, the creditor would not be entitled to protection of the accruing interest value of
the claim.); *In re Lane*, 108 B.R. 6 (Bankr.Mass.1989) (same).  *See also Orix Credit Alliance, Inc. v. Delta
Resources, Inc.*, 54 F.3d 722, 728-29 (11th Cir. 1995)(adequate protection does not serve to protect against erosion
of an equity cushion by accruing interest but only against a decline in value of collateral).
[21] *See also In re Delta Resources, Inc.,* 54 F.3d 722, 730 (11th Cir. 1995)( "the oversecured creditor's allowed
secured claim for postpetition interest is limited to the amount that a creditor was oversecured at the time of
filing.").

-15-

The United State Supreme Court further reasoned that because a secured creditor's claim is limited to the value of its collateral, if an under-secured creditor were paid post-petition interest on the value of its collateral then the amount of its secured claim would increase with the passage of time as the stay continues, which is not what is intended under the Bankruptcy Code.[22]

Applying these principles explicated in *Timbers*, a secured creditor is not entitled to adequate protection under 11 U.S.C. § 362(d)(1) to compensate or protect it from erosion of its security cushion by post-petition interest accrual for at least four reasons. First, a secured creditor is entitled to adequate protection under 11 U.S.C. § 362(d)(1) only to compensate or protect it from a decline or threatened decline in the value of the estate's interest in property that is the creditor's collateral. Payment of post-petition interest as adequate protection to maintain a security cushion does not serve this purpose. Second, a secured creditor is paid post-petition interest out of its security cushion. Therefore, payment of post-petition interest necessarily reduces the amount of the security cushion. Third, if payment of post-petition interest had no effect on the amount of the creditor's security cushion, then the amount of post-petition interest accrual would not be limited by the amount of the security cushion contrary to the requirement of 11 U.S.C. § 506(b). Finally, if a secured creditor were entitled to payment of post-petition interest to maintain its security cushion, it would create the anomalous result that a slightly

---

[22] In *Timbers*, the Court explained:

In subsection (a) of this provision the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues-since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time. No one suggests this was intended. The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." H.R.Rep. No. 95-595, pp. 181, 356 (1977); see also S.Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854, 6141, 6312. We think the phrase "value of such entity's interest" in § 361(1) and (2), when applied to secured creditors, means the same.

Timbers, 484 U.S. at 372; 108 S.Ct. at 631.

Case 11-12554-j7    Doc 91    Filed 08/29/11    Entered 08/29/11 17:37:14 Page 16 of 24

over-secured creditor could accrue post-petition interest in an amount vastly disproportionate to its security cushion, while a slightly under-secured creditor would accrue no post-petition interest.

Likewise, BANK'34 is not entitled to adequate protection to compensate it for erosion of its security cushion by post-petition attorney's fees. To the extent BANK'34 asserts a secured claim for post-petition attorneys fees , under 11 U.S.C. § 506(b) post-petition attorneys fees, like post-petition interest, is paid out of and is limited by the amount of the Bank's security cushion. Section 506(b) contains the same limitations on the amount of an allowable secured claim for post-petition attorney's fees as it does for post-petition interest accrual. *See* 11 U.S.C. § 506(b).

3. *Stay Relief Under 11 U.S.C. § 362(d)(2)*

BANK'34 asserts that the Court should grant stay relief under Bankruptcy Code § 362(d)(2). That section provides for relief from the automatic stay with respect to an act against property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). BANK'34 asserts that the Debtors have no equity in the Real Property taking into account interest and tax accruals during the expected marketing period following a foreclosure sale, additional attorney's fees BANK'34 will incur to collect its claim, costs of sale, and the inherently distressed nature of a sale of real estate owned by a financial institution. Additionally, BANK'34 asserts that the Debtors do not have a feasible chapter 11 plan in prospect. Because the Court finds that the Debtors have equity in the Real Property, is not necessary for the Court to reach the second prong of the requirement for stay relief under 11 U.S.C. § 362(d)(2), that such property is not necessary to an effective reorganization.

-17-

Unlike the adequate protection provision of 11 U.S.C. § 362(d)(1), which focuses on harm to a secured creditor from the decline or threatened decline in the value of the estate's interest in property that is its collateral, 11 U.S.C. § 362(d)(2) focuses on whether keeping the stay in place will benefit other creditors. The debtor has equity in property pursuant to 11 U.S.C. § 362(d)(2)(A) if a comparison of the value that can be realized from the sale of the property in the bankruptcy case with the aggregate amount of all secured claims against the property shows that value from a sale can be realized for the benefit of unsecured creditors.[23] If there is no value to be obtained from such a sale that can benefit unsecured creditors, and there is no confirmable plan in prospect for which the property is needed to otherwise provide a benefit to creditors or other parties in interest, then stay relief under 11 U.S.C. § 362(d)(2) is appropriate.[24] Whether the Debtors have equity in the Real Property, thus, requires the Court to consider two elements: 1) the value that can be realized from the sale of the Real Property in this bankruptcy case; and 2) the aggregate amount of all secured claims against the Real Property. The Court will consider each element separately.

---

[23] *E.g. In re Indian Palms Associates, Ltd*., 61 F.3d 197, 208 (3rd Cir. 1995)("equity analysis …focuses on the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of all unsecured creditors."); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 391-92 (6th Cir. 1986)(same); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984)(defining equity cushion as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during time the automatic stay remains in effect"); *In re Ebersole*, 440 B.R. 690, 699 (Bankr. W.D.Va. 2010)(" equity analysis in that section [section 362(d)(2)] focuses on the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of all unsecured creditors."); *In re Heritage Oracle, LLC*, 2010 WL 4259772, *2 (Bankr.D.Ariz. 2010)(same). *Cf. In re Gindi*, 642 F.3d 865, 875 (10th Cir. 2011)(a debtor "has no equity in property ... when the debts secured by liens on the property exceed the value of the property.")(citation omitted).

[24] Property is necessary to an effective reorganization under 11 U.S.C. § 362(d)(2)(B) if "the property is essential for an effective reorganization that *is in prospect*. This means . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time….'" And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." *Timbers*, 484 U.S. at 375-76, 108 S.Ct at 633.

*Value*

BANK'34 argues that in considering value the Court should factor in the inherently distressed nature of a sale of the Real Property by BANK'34 if it acquires the Real Property at a foreclosure sale. But the appropriate measure of value under 11 U.S.C. § 362(d)(2)(A) is not what the lender could obtain if it sold the Real Property; it is the amount that the Debtors or a bankruptcy trustee could realize upon a sale in this bankruptcy case. BANK'34's appraiser testified that the fair market value of the Real Property based on a marketing period of "up to" 12 months is $1,860,000. The value that can benefit an unsecured creditor upon a sale of the Real Property requires deduction of the estimated $186,000 of costs of sale.[25] The Court finds that $1,674.000 is the value of the Real Property for purposes of determining whether the Debtors have equity in the Real Property under 11 U.S.C. § 362(d)(2)(A), after deducting costs of sale.[26]

*The Amount of Secured Claims Against the Property.*

BANK'34 holds the only secured claim against the Real Property. Its claim as of the date of the final hearing on its motion for relief from stay was $1,497,564.08, excluding certain amounts for which no evidence was presented.[27] The difference between the value of the Real Property (after deducting estimated costs of sale) and the amount of BANK'34's secured claim

---

[25] *E.g. In re Barnes*, 2011 WL 2709240, *2 (Bankr. W.D.Mich. 2011)(citing *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 392 (6th Cir.1986) ( quoting *In re Mellor*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984))("In bankruptcy, "[e]quity ... is the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors."); *In re Pineda*, 2010 WL 569547, *4 Bkrtcy.W.D.Tex. 2010); *In re Wrobel*, 2007 WL 7230978, *3 (Bankr.S.D.Cal. 2007); *In re Steffens*, 275 B.R. 570, 578 (Bankr.D.Colo. 2002).

[26] The estimated sale costs include a broker's commission. No credible evidence was presented to the Court that the Real Property realistically could be sold without the assistance of a broker.

[27] BANK'34 did not present evidence of the amount of attorney's fees BANK'34 incurred to the date of the hearing allowable under the applicable loan documents, or of the amount of accrued interest calculated at the difference between the default and non-default rates. Further, no evidence was presented of the amount of accrued 2011 property taxes prorated to the date of the hearing. The Court therefore will disregard these amounts. The Court is not deciding whether BANK'34 is entitled to post-petition interest at the default rate. The amount of BANK 34's claim included unpaid property taxes against the Real Property for the 2009 and 2010 tax years.

against the Real Property as of the date of the hearing on the Bank's stay motion is $182,435.92.

BANK'34 argues that the Debtors have no equity in the Real Property because all or substantially all of this equity will be eroded by interest accrual and attorney's fees incurred by BANK'34 prior to a sale of the Real Property. The Court disagrees for two reasons. First, BANK'34's own calculation shows that the Debtors have equity in the Real Property. BANK'34 projects at least $31,717.65 of net proceeds to the Debtors after a sale in twelve months that pays the Bank'34 in full. Second, future interest accrual to secured lenders or attorneys fees expected to be incurred in the chapter 11 case should not be included in the amount of debt secured by property for purposes of determining equity under 11 U.S.C. § 362(d)(2)(A). Because the standard for determining value is the amount that can be realized from the sale of the property for the benefit of the unsecured creditors, doubts as to the required marketing period for a sale and the amount of attorney's fees to be incurred that are allowable as part of the secured claim should be resolved in favor of the estate.

Having determined that the Debtors have an equity in the Real Property under 11 U.S.C. § 362(d)(2)(A), relief from the stay under 11 U.S.C. § 362(d)(2) must be denied.

B.      Motion to Prohibit Use of Cash Collateral

BANK'34 requests an order prohibiting the Debtors from using cash collateral resulting from the operation of Tom Young's Fitness Center in Las Cruces, including member payments for use of the facilities, cash, cash equivalents, deposit accounts, and rents. *See Emergency Motion to Prohibit Use of Cash Collateral. Docket No. 29.*

Bankruptcy Code §§363(c)(2) and (4) provide:

(2)  The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
     (A)  each entity that has an interest in such cash collateral consents; or

-20-

(B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(4)  Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control. 11 U.S.C. §363(c)(2) and (4)

Laguna LLC, not the Debtors, owns and operates the Tom Young's Fitness Center business.  Laguna LLC did not pledge any property to BANK'34.  Further, the evidence before the Court does not establish that Laguna LLC is the alter ego of the Debtors or that Laguna LLC's corporate form should be disregarded.[28]  BANK'34 does not have a security interest in any assets of Laguna LLC, including payments by fitness center members for use of its facilities, or its cash, cash equivalents, deposit accounts, or rental income.  Therefore, Laguna LLC's use of its cash and cash equivalents is outside the proscriptions of 11 U.S.C. §363(c).  To the extent BANK'34 moves for an order prohibiting Laguna LLC from using its cash the motion will be denied.

BANK'34 has a security interest in rents paid to the Debtors by Laguna LLC for its use of the Real Property, and in the Debtors' cash, rights to receive payments, and general intangibles.  BANK'34 asserts that its security interest in general intangibles attaches to the Debtors' discretionary post petition member withdrawals from Laguna LLC.  The Court disagrees.  Regardless of whether BANK'34's security interest in general intangibles attaches to the Debtors' member interests in Laguna LLC, the security interest does not extend to post-petition member withdrawals.

Bankruptcy Code §§ 506(a) and (b)(1) provide:

---

[28] The evidence before the Court does not establish that the Debtors have so manipulated the limited liability company to further their own individual interests that the identity of the limited liability company has merged into its members, that the corporate veil should be pierced, or that Laguna LLC and the Debtors are alter egos. *See Scott v. AZL Resources, Inc.*, 107 N.M. 118, 121-122, 753 P.2d 897, 900-901 (N.M. 1988) and *Scott Graphics, Inc. v. Mahaney*, 89 N.M. 208, 211, 549 P.2d 623, 626 (Ct.App.1976) regarding the standard applied in New Mexico for disregarding a corporate entity, piecing a corporate veil or finding that an entity and its shareholders are alter egos.

-21-

(a)  Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b)(1) Except as provided in sections 363, 506 (c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 506(b)(1).

Under these sections, except as provided by 11 U.S.C. § 506(b)(2), which is inapplicable to member withdrawals, BANK'34's prepetition liens do not extend to property in which the Debtors had no interest on the date they commenced their chapter 11 case unless the property is proceeds, products, offspring, or profits of property in which the Debtors had an interest on that date.[29]

The Tenth Circuit's decision in *In re Hastie*, 2 F.3d 1042 (10th Cir. 1993) is dispositive of BANK'34's claim that its liens extend to post petition member withdrawals.  In *Hastie*, the Tenth Circuit held that "ordinary cash dividends out of capital surplus and earned income are not proceeds of the common stock as the distribution of the dividend is not a disposition of the stock," *Hastie*, 2 F.3d. at 1046, and, therefore, under 11 U.S.C. §§ 552(a) and (b)(1) such funds are not the cash collateral of a creditor holding a lien against the stock.  *Id*. at 1047.  Likewise, BANK'34's lien against the Debtors' member interests in Laguna LLC does not extend to post

---

[29]  *See e.g. Cadle Co. v. Schlichtmann, 267 F.3d 14, 19* (1st Cir. 2001)(except as otherwise provided in 11 U.S.C. § 552, the purpose of that section is to prevent a creditor's pre-petition security interest in after-acquired property from attaching to property acquired by the estate or debtor-in-possession after the filing of the bankruptcy petition); In re Las Vegas Monorail Co., 429 B.R. 317, 342 (Bankr. D.Nev. 2010)(Section 552(b) is an exception to the rule under Section 552(a) that a creditor may no longer enforce its liens in after-acquired property against the estate).

petition member withdrawals, which are a form of distribution on account of their equity interests in Laguna LLC.

Under 11 U.S.C. § 552(b)(2), BANK'34 does have a lien against rents the Debtors receive from Laguna LLC post-petition for its lease of the Real Property.[30] Notwithstanding Tom Young Sr.'s testimony that Laguna LLC booked the $2,000 as rent in error because the rent mistakenly was specified on the check by which the payment was made, the Court finds that the funds were in fact paid by Laguna LLC as rent. However, because the Debtors believed the rents were not BANK'34's cash collateral, the amount of rents used was relatively small, and the Court is ordering the Debtors to pay $2,000 to BANK'34 as part of adequate protection, the Court finds it unnecessary to issue an order prohibiting the Debtors from using cash collateral. Even absent an order of the Court, the Debtors are bound by the proscriptions of 11 U.S.C. §363(c)(2) and (4) regarding the use of cash collateral.

CONCLUSION

For the foregoing reasons, the Court will deny BANK'34's Motion for Relief From Stay and Motion to Prohibit Use of Cash Collateral but will order adequate protection for BANK'34 consistent with this memorandum opinion. An order consistent with this memorandum opinion will be entered.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

---

[30] 11 U.S.C. § 552(b)(2), provides in part:
Except as provided in sections 363, 506 (c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546 (b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property…, then such security interest extends to such rents…acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

-23-

Date entered on docket:   August 29, 2011

COPY TO:
James A Roggow
Martin, Lutz, Roggow & Eubanks, P.C.
PO Drawer 1837
Las Cruces, NM 88004-1837
*Attorneys for BANK'34*

William F. Davis
Andrea Steiling
William F. Davis & Assoc., P.C.
6709 Academy NE, Suite A
Albuquerque, NM 87109
*Attorneys for Debtors*